SANDOZ v. BERIDON.

DEJEAN v. SAME.

Nos. 1166, 1167.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1933.

his negligence and fault in driving on the highway.

Dr. Beridon, answering in each case, admits that a collision occurred between the automobile he was driving and another in which Sandoz and Dejean were riding and which Dejean was driving, but he denies that the plaintiffs suffered any injuries as a result of the collision; he denies the fault and neglect alleged against him, and alleges that the collision occurred through no fault or neglect on his part.

In answer to the Sandoz suit, he denies that he is responsible for the injuries which Sandoz sustained, and alleges that the collision was brought about as a result of the fault and neglect of Sandoz. In the Dejean case, he alleges that the collision was brought about as the result of the fault and neglect of Dejean. He prays that the demand of both the plaintiffs be refused and rejected.

For written reasons assigned there was judgment in the lower court in favor of Sandoz for $4,700, with interest, and in favor of Dejean for $2,109.40, with interest.

From the judgment in each case the defendant has appealed. The plaintiff in each case has filed an answer to the appeal praying that the judgment in his case be increased to the amount claimed in his petition.

The evidence shows that Lawrence B. Sandoz and James A. Dejean, together with Sidney Dejean, Henry D. Larcade, Jr., L. J. Larcade, Adolph Jacobs, Rene Sibille, and Fred Parnell, convened at the Hook-In-Club, the site of which is about two miles south of Opelousas near the Opelousas-Lafayette highway, and engaged in a game of poker. The gentlemen were all the best of friends. A little after 12 o'clock noon they decided to take a recess, go home for dinner, and return in the afternoon and finish the game.

H. D. Larcade, Jr., driving, accompanied by L. J. Larcade and Adolph Jacobs, were the first to start. Dr. Beridon followed in an automobile driven by himself. Next Rene Sibille driving, accompanied by Sidney Dejean and Parnell; then came Sandoz and James A. Dejean in an automobile belonging to and driven by Dejean; Sandoz riding therein as his guest.

While the parties left in the order mentioned, the time of their departure was so close together that each automobile may be said to have started almost immediately after the other. Dr. Beridon passed the Larcade car about the time it reached the highway, which placed him in the lead. The Sibille car next passed the Larcade car and then came the automobile occupied by Dejean and Sandoz. They passed the Larcade car, then the car driven by Sibille and overtaking Dr. Beridon attempted to pass him,

St. Clair Adams, and St. Clair Adams, Jr., both of New Orleans, for appellant.

L. L. Perrault, of Opelousas, for appellees.

ELLIOTT, Judge.

A collision took place between an automobile belonging to and while being driven by James A. Dejean and another belonging to and while being driven by Dr. George R. Beridon in which the plaintiffs, Lawrence B. Sandoz and James A. Dejean, were very seriously injured. The impact occurred on the Opelousas-Lafayette highway just south of the southern limits of the city of Opelousas a little after the noon hour on August 28, 1932.

Sandoz and Dejean each brought suit against Dr. Beridon for damages. Sandoz claims to have sustained damages in the collision to the extent of $9,000, and Dejean $6,500 on said account. After having been put at issue, the suits were consolidated and tried together, separate judgment being rendered in each case. For the purpose of stating and deciding the two cases, we will follow the course taken in the lower court.

Sandoz and Dejean each place the blame for the collision on Dr. Beridon; each claims in his petition that the collision resulted from

but in doing so the collision occurred which has furnished the ground for this suit.

Dr. Beridon lives on Court street in the southern part of Opelousas. A public road, referred to by the witnesses as a dirt road, leaves the western side of the highway just south of the limits of Opelousas and leads west, intersecting Court street just south of where Dr. Beridon lives, furnishing a short cut to his home, while the highway which Sandoz and Dejean proposed to keep continued on direct into Opelousas.

When Dr. Beridon came near this intersection, he decided to leave the highway and take this short cut home. As the highway led northward, he was on the right-hand side of it, and this made it necessary for him to turn to the left across the highway in order to enter this intersection. The main highway is practically straight at this place. The pavement is 18 feet wide and on each side there is a 6 or 8 foot shoulder. There was nothing to obstruct his view looking backward through a rear view mirror, with which his automobile was equipped, for a distance of about 300 feet.

The law regulates driving on the highways and provides rules for the government of the same. The parties refer in their briefs to Act No. 21 of 1932 as the law on this subject. This act did not become effective under the terms of the act until January 1, 1933. Act No. 296 of 1928 is therefore the governing law as to the present case.

First comes section 5 on the subject of speed. As to parties about to be overtaken, it is provided: "Section 18. (a) Except as otherwise provided in this section, the driver of a vehicle * * * when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning such vehicle to the left. For the purpose of this section, the center of the intersection shall mean the meeting point of the medial lines of the highways intersecting one another."

"Section 19. (a) The driver of any vehicle upon a highway before * * * turning from a direct line shall first see that such movement can be made in safety * * * and whenever the operation of any other vehicle may be affected by such movement shall give a signal as required in this section plainly visible to the driver of such other vehicle of the intention to make such movement.

"(b) The signal herein required shall be given either by means of the hand and arm in the manner herein specified. * * * Whenever the signal is given by means of the hand and arm, the driver shall indicate his intention to * * * turn by extending the hand and arm horizontally from and beyond the left side of the vehicle."

"Section 20. . (a) When two vehicles approach * * * an intersection at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right except as otherwise provided in Section 20.

"The driver of any vehicle traveling at an unlawful speed shall forfeit any right-of-way which he might otherwise have hereunder.

"(b) The driver of a vehicle approaching but not having entered an intersection shall yield the right-of-way to a vehicle within such intersection and turning therein to the left across the line of travel of such first mentioned vehicle, provided the driver of the vehicle turning left has given a plainly visible signal of intention to turn as required in Section 18."

These rules are intended for the safety of those driving automobiles on the highways. It is obligatory on those, intending to turn to the left, to first see if it can be done in safety and to also, in addition, first give the signal with the extended hand and arm, which the statute provides for.

Dr. Beridon testifies that he did look back through his rear view mirror and that he could see back to the curve in the road, which we estimate must have been about 300 feet; that he saw no automobile coming; and that he also put out his hand.

We excerpt from his testimony on the subject as follows:

"Q. As I understand it you looked in your rear view mirror about 15 or 20 feet before you reached a point opposite the south side of the dirt road? A. No sir I started turning there, but I had already looked in my rear view mirror.

"Q. How far away from the point where you turned had you looked? A. Just a short distance before I made the turn, as one usually does.

"Q. The looking was almost coincident with the turning? A. After I satisfied myself there was nobody back of me, I felt safe in making the turn.

"Q. Did you look and then turn or was there any interval between the looking and turning? A. There may have been a short interval, I don't think they were spontaneous.

"Q. How far had you gone across the road when this accident occurred? A. When I started to turning I heard like a noise which I thought was in my car and at that time my left front wheel was just about to leave the east side of the road and I turned over and saw a car coming. I presume I may have gone two or three feet from the left side of the road when I realized the car was still coming on the left side and then I attempt-

ed to straighten out and I don't think I went over four feet on the left side of the road.

"Q. Did you see the car coming? A. Yes.

"Q. When did you first see it? A. When I started to make my turn, just as my car started to face N. W.

"Q. How fast were you going at that time? A. I was going pretty slow.

"Q. In terms of miles? A. I would say about 10, 11, or 12 miles an hour."

In another place:

"Q. You looked into the mirror and saw nothing coming when you did look and then you began turning, what else, if anything, did you do? A. After I looked in my mirror my car progressed a few feet, then I put out my left hand and proceeded to turn and then I saw the car approaching and turned again to my right.

"Q. When you saw the approaching car, you had already put out your hand? A. I put out my hand as I was making the curve.

"Q. As you were turning to the left? A. Yes."

He estimated that plaintiff's automobile was from 125 to 160 feet behind him when he first saw it. The above is a fair example of defendant's several statements about looking back and sticking out his hand.

The two plaintiffs also gave their testimony as to when defendant commenced to turn to the left and when they first saw his hand.

The plaintiff Dejean says on this subject:

"Q. What, if anything, attracted your attention to Dr. Beridon's car at this time? A. We were coming right behind him and he was going slow. I cut to the left on the west side of the black line and I noticed Dr. Beridon was about to make a turn. He had his hand on the outside of his car and when I saw he was going to make the turn, I hit my horn and he continued to go and I guess I was about 15 or 20 yards from him."

The testimony of Mr. Sandoz is to the effect that he did not see any signal.

"Q. Did you see any signal or sign or warning or hear any that may have been given by Dr. Beridon prior to his turning across the road? A. I didn't see any, if he gave any, and I don't think I could have failed to see, if he had, because I was looking right at his car and the exclamation I made at that particular time would indicate I didn't see any."

The law, in providing that a driver before turning from a direct line shall first see that the movement can be made in safety, and shall in addition give a signal plainly visible to the driver of any other vehicle that may be affected by such movement, intends that the looking and the extension of the hand and arm must be done at a time which will accomplish the purpose of the law.

In this instance we are satisfied from the evidence that the defendant either looked back through his rear view mirror at a time when plaintiff's automobile was not in sight, therefore too soon and served no purpose, or he did not look carefully, or looked too late, and it served no purpose on that account. If Dr. Beridon had looked back carefully just before he commenced to turn across the highway to the left, he would have been bound to have seen plaintiff's automobile. As already stated the road was practically straight at that place, the view unobstructed, and the Dejean automobile was certainly so close at hand that defendant could not help seeing it, if he had looked carefully. And when the duty to look exists, and there is nothing to prevent seeing, a party must be charged with seeing what he would have seen had he looked.

Defendant also claims that he put out his hand. Merely putting out the hand does not satisfy the law. The law provides that he must extend the hand and arm horizontally so as to be plainly visible to the driver of the vehicle that may be affected by the movement. In this instance defendant did not put out his hand until he commenced making his turn, which was too late to serve the purpose of the law. It should have been done at a time when the driver of the Dejean car could have seen it in time to slow down, stop, or swerve to the right as the exigencies of the situation demanded. As it was, the signal and the impact was in point of time only an instant apart.

The evidence shows that the defendant was negligent and at fault in not ascertaining, before turning to his left across the highway, that the movement could be made in safety, and also in not timely giving a signal of his intention by extending his hand and arm in such a way as to be plainly visible to the driver of an automobile coming behind him. His failure in that respect amounted to a tacit signal to Dejean that he might pass in safety. The conclusion of the lower court on this subject is correct.

The defendant alleges in his answer in the Sandoz suit that Sandoz, as the guest of Dejean, was guilty of negligence independent of that of Dejean of such nature that it contributed to bring about the collision, and that Sandoz cannot recover on that account.

The dirt road into which defendant attempted to turn had been made a public road about a year and eight months before the collision took place, but just how long it had been open to public use is not clear. We think the dirt road may be looked upon as a new road, and though well known to Dr. Beridon and a number of others living near it, its existence was not a fact generally known to the people of Opelousas. Sandoz admits in his testimony that he knew the road was there,

but testifies that he had never used it, and we understand him to say that he did not know it was a public road until after the collision.

The record contains a picture of the road, showing its appearance at its intersection with the highway. The picture indicates that it was neglected by the public authorities, and justifies belief in the testimony of Sandoz that he never thought of the road, nor that Dr. Beridon might turn into it.

Mr. Sandoz testifies that when he saw the front wheels of the Beridon car·turn across the black line he hollered to Dejean, "Look, he is turning in"; but Dejean, having speeded up to pass, and going, he says, at about 40 or 45 miles an hour, was so close to Dr. Beridon at the time, that a collision was inevitable. If Dr. Beridon, however, without looking to the rear, had timely given the statutory signal that he was about to turn to the left across the highway, it could be said that Sandoz should have seen it and communicated it to Dejean and the latter could have taken timely steps to check his car or swerve over to the right-hand side of the road, and there would have been no collision. If he had not communicated it and the collision had resulted from his failure to do so, then there would be support for defendant's charge of independent negligence on the part of Sandoz.

In Churchill v. Texas & Pacific R. R. Co., 151 La. 726, 92 So. 314, 315, the court said: "Churchill, not having charge of the operation of the machine, was not required to keep a lookout for danger, but could rely upon the discharge of that duty by the driver, who was responsible for its operation; and it not appearing that the deceased saw the approaching train until almost the instant of the collision, and, having shouted the warning as soon as it was discovered, we do not find that he was guilty of negligence."

In Brown v. Dalton, 143 So. 672, we held that the automobile in which Brown was riding was being driven at excessive speed with his knowledge and assent; that Brown was inattentive and should have seen the danger ahead and protested to the party with whom he was riding.

In Delaune v. Breaux, 18 La. App. 609, 135 So. 253, 254, the collision took place at night and was not as the result of a left-hand turn by a forward car for the purpose of entering an intersecting road, but the question of negligence vel non on the part of a guest as barring recovery was the question in the case. In that case this court used the following language: "The guest, whether seated on the front or back seat of an automobile cannot be placed on the same footing with the driver in reference to the care, caution, and vigilance which should be required of the one driving such a high-powered machine. The guest is not expected, as a general proposition, to have seen what the driver 'should have seen'; otherwise the same measure of vigilance would be placed upon him as on the one operating the car. If such were the rule, it would be incumbent on the guest 'to keep a look-out for danger' and without placing any reliance on the driver, which would be destructive of the requirement in such cases, recognized in the Churchill Case, above cited."

The decision in the Delaune Case was reviewed by the Supreme Court, 174 La. 43, 139 So. 753, 755. The Supreme Court, one of the justices dissenting, speaking of the responsibility of a guest, used this language: "He may rely reasonably on the driver to discharge that obligation. Where, however, the guest is aware of the fact that there is danger ahead, which apparently is unknown to the driver or may be unknown to him, or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver, it is the duty of the guest to warn the driver of it at once, and if the guest fails to do so, he is guilty of negligence contributing to the accident and cannot recover." It was also held that the views of the court in the Delaune Case were not inconsistent with those expressed in Lorance v. Smith, 173 La. 883, 138 So. 871.

In the present case, we do not find anything that Sandoz should have done or did not do sooner than was done, the instant he saw that Dr. Beridon was turning across the road. We find that Dr. Beridon did not give a proper nor timely signal, as intended by the statute, that he was about to turn to the left across the highway, and that the collision was not brought about as the result of any independent fault or neglect on the part of Sandoz, as the guest of Dejean. We agree with the lower court that the defendant, Beridon, is responsible for the damages which Sandoz sustained in the collision.

The defendant alleges that Dejean was negligent and at fault, and that even if defendant be held to have been negligent and at fault in the matter of causing the collision, contributing fault and neglect on the part of Dejean prevents recovery on his part.

Act No. 296 of 1928, § 14 (a), provides: "The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof, and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle."

Section 16. "The driver of a vehicle upon a highway about to be overtaken and passed by another vehicle approaching from the rear shall give way to the right in favor of the overtaking vehicle on suitable and audible signal being given by the driver of the overtaking vehicle, and shall not increase the

speed of his vehicle until completely passed by the overtaking vehicle."

The following excerpt affords what we consider a fair illustration of Dejean's testimony on this subject:

"Q. What, if anything, attracted your attention to Dr. Beridon's car at this time? A. We were coming right behind him and as he was going slow, I cut to the left on the west side of the black line and I noticed Dr. Beridon was about to make a turn. He had his hand on the outside of his car and when I saw he was going to make the turn, I hit my horn and he continued to go and I guess I was about 15 or 20 yards from him.

"Q. What is the first thing you saw? Did you see Dr. Beridon's car beginning to turn to the left before you saw his hand sticking out of the window or did you see the hand before you saw the turn? A. I think when I hit the horn he must have turned his hand and still continued to make the turn and at that time I accelerated my speed to prevent hitting him broad side.

"Q. How fast were you going at the time when you saw Dr. Beridon's car beginning to make this turn to the left across the road? A. I guess I must have been going about 40 miles an hour.

"Q. What position in the road did Dr. Beridon's car occupy at the time you accelerated your speed? A. He was about half way across the black line on the west side.

"Q. What, if anything, did you do at this time in an effort to avoid a collision? A. When I saw Dr. Beridon making that turn, it was such a surprise I just hollered something to Mr. Sandoz. I said: 'Look he is going to turn.' We couldn't avoid it. If I didn't duck toward the ditch, I figure I would have hit him broad side on the side he was driving. That is why I ducked to the west side of the road on the left."

Mr. Sandoz in his examination said on this subject:

"Q. From that point, Mr. Sandoz, please explain to the court what happened? I mean state fully the facts surrounding the accident and the facts immediately antecedent to the accident as far as you know them. A. As I previously stated, Dr. Beridon's car was traveling on the right hand side of the highway and just east of the black line, that divides the highway and marks the center of the highway. We were coming behind him and at a point about 150 to 175 feet from the cross-road Mr. Dejean got on the left hand side of the road. By that time Dr. Beridon's car had gotten practically up to the point where the road goes into the highway. We were probably getting ready to pass the car, Mr. Dejean having gotten on that side, I presume he intended to pass the Beridon car. When we got to a point about 75 feet from the edge of the dirt road, that meets the highway at the point where the accident occurred, I noticed the front wheel of Dr. Beridon's car across the black line and as it did so, I hollered to Mr. Dejean, 'look out he is turning in,' and at that particular time Mr. Dejean had his hand up already to blow the horn and he touched the horn, the blow was not a long blow but he blew it and he immediately grabbed the side of his steering wheel and by that time Dr. Beridon had gotten two or three feet this side of the black line in the road on the west side of the black line. When that signal was given his front wheel seemed to turn a little to the north as though he intended to right his car and the impact took place about that time. I don't remember anything after the impact took place. I know the car went over.

"Q. At the time Mr. Dejean got on the left hand side of the road or west side of the road for the purpose of passing the forward car, how far was this car approximately from the forward car? A. I should estimate, that at the time he got on the left hand side of the road, Dr. Beridon had gotten to a point about 20 feet from the corner of the road, maybe a little less, corner of the dirt road.

"Q. How far was Mr. Dejean's car in the rear of Dr. Beridon's car at that time? A. I should estimate 150 or 160 feet.

"Q. At the time that you observed, that the forward car was turning across the road, beginning to turn across the road, and you made the exclamation you have just related, how far in the rear of the Beridon car was Mr. Dejean's car? A. I should judge he must have been about 140 to 150 feet, the front of his car from the back of the Beridon car.

"Q. How far was Mr. Dejean's car in the rear of Dr. Beridon's car, when Mr. Dejean got on the left of the road to pass? A. I believe I said about 160 feet.

"Q. At the time when you first noticed, that Dr. Beridon's car was beginning to turn across the road, how far in the rear of the Beridon car was Mr. Dejean's car? A. I think he was about 60 or 75 feet then. We were gaining on him all the time, because we were going faster than he was."

He also estimated the speed of the Dejean car at the time as about 40 miles an hour and that of Dr. Beridon's at about 20 miles an hour.

In one of defendant's statements on the subject he says:

"Q. How far was Mr. Dejean's automobile from you when you first saw it? A. About 125 to 150 or 160 feet, when I first saw the car there.

"Q. That wasn't when you looked in your rear view mirror that you saw that? A. No, that was after I started to make the turn.

"Q. That was when you first heard it? A. Yes, Sir.

"Q. When you saw it was when you first heard it. A. I didn't know I heard the car. I heard a noise and put my head out and I saw the left side of the automobile coming and I thought it was Henry Larcade or didn't see whether it was a Ford or Buick but after my car squared more and the car was getting nearer to me, I had a clear vision of the car. I saw it wasn't Henry but didn't know yet who it was.

"Q. The car that you saw at a distance of from 125 to 160 feet at the time you began to make the turn was the car of Mr. Dejean. A. Yes the car that hit."

It seems that Dejean was likely within about 30 feet of Dr. Beridon when he sounded his horn and instead of checking, he accelerated his speed, and struck Dr. Beridon so quickly afterwards that the time within which it was done may be estimated to have been about a second or less, and certainly without giving Dr. Beridon time in which to turn out of the way. Dr. Beridon was entitled to "suitable and audible" signal given in a way to be heard and in time to enable the car about to be passed to keep to the right and not turn to the left in the pathway of the passing car. If not given in time, the purpose of the law is no better served than if not given at all. Dr. Beridon was not asked if he heard the horn on Dejean's car. The only noise he speaks of hearing was that made by the near approach of the Dejean automobile. If Dejean had given a timely, suitable, and audible signal of his approach, Dr. Beridon presumably would not have attempted a left-hand turn across the road at that time, but would have stopped on the right-hand side of the road, opposite the intersection, and waited in safety for the overtaking automobile to pass.

It seems to us that even though Dr. Beridon failed to look behind carefully and at a proper time and to extend his hand and arm, the plaintiff Dejean, as driver of the overtaking vehicle, was equally neglectful and at fault in not timely giving the suitable and audible signal, which the law required him to give to the party about to be passed. There was a mutual failure of duty, each contributing to bring about the collision. We therefore conclude that as against Dejean the defense of contributory negligence is good and that he has no right to recover on that account. The judgment of the lower court in favor of Dejean will therefore be set aside and his demand refused and rejected.

▉ The amount, which Sandoz should recover, is very seriously contested. The defendant contends that the amount fixed by the lower court is excessive.

Four physicians gave testimony concerning the condition of Mr. Sandoz as a result of his injuries. One of these physicians treated him almost immediately after he was injured and in fact has known and observed Mr. Sandoz since he was a youth. This local physician is supported in his views by the testimony of an eminent specialist. According to them, Mr. Sandoz suffers from spondylolisthesis and hypertrophic arthritis. The spondylolisthesis they say formerly existed, but his condition has been aggravated and made worse as a result of the injury received in this collision.

Dr. Bienvenu does not think the present incapacity of Mr. Sandoz is permanent. He thinks that in a year or so his condition will improve so that he will be able to play golf again.

Dr. O'Ferrall is not so optimistic in that respect. He thinks the result of the collision will be enduring and may cause considerable trouble as time goes by. Drs. Bienvenu and O'Ferrall have studied plaintiff's condition and treated him for his injuries. Therefore their opinions are entitled to additional weight on that account.

Two other eminent physicians have examined Mr. Sandoz for the purpose of expressing an opinion concerning his condition on the trial of this case. One of them, an expert radiologist, made X-ray pictures and also examined the pictures from which Dr. O'Ferrall testified. The other has made a specialty of orthopædic surgery. These physicians testified that they could find no condition of spondylolisthesis nor of hypertrophic arthritis. They give it as their opinion at the time of the examination, made several months after the collision, that plaintiff suffered nothing more in the collision than a severe sprain of the back, and will, in a short time, be as well as he ever was.

It is certain that plaintiff has endured severe suffering and he may have further trouble and he may have endured an aggravation of a former ailment, which may or may not have some permanent effect. We think he is entitled to substantial damages, but the amount allowed in the lower court is, in our opinion, too high.

He was allowed $4,000 on account of his personal injuries, $500 for loss of practice as attorney at law, and $200 for medical expenses. We think the item of $4,000 should be reduced to $2,500; but that the items of $500 for loss of practice and $200 for medical expenses should remain as fixed by the lower court. This will reduce the total amount to $3,200.

For these reasons the judgment appealed from in favor of James A. Dejean for $2,100.40 will be annulled, avoided, and set aside,

and the demand of the said Dejean will be refused and rejected.

The judgment appealed from in favor of Lawrence B. Sandoz is reduced from $4,700 to $3,200, and as thus amended affirmed; this last amount to draw legal interest from judicial demand until paid. The defendant, Dr. George R. Beridon, is to pay costs in both courts.